Brenda BRADLEY and Kathleen Sasser *v.* Johnny WELCH, Steve Glass, Hodge Walker, Dixie Youth Baseball, Inc., Lafayette County Dixie Baseball, Pines Swim Club, Inc., and Maria Talley

CA 05-588 228 S.W.3d 559

Court of Appeals of Arkansas
Opinion delivered February 15, 2006

*Miller, James, Miller & Hornsby, L.L.P.*, by: *Troy Hornsby*, and *Houston Madison Smith* for appellants.

*Wright, Lindsey & Jennings*, by: *Charles Alston Jennings Jr.*, for appellee Johnny Welch.

*Staci Dumas Carson* and *Richard Nathaniel Watts*, for appellee Maria Talley.

JOHN MAUZY PITTMAN, Chief Judge. This case arises from the near-drowning of eight-year-old Dedrick Bradley at a swimming party held for players in a youth baseball league. Appellant Brenda Bradley, who is Dedrick's grandmother and primary care-taker, and appellant Kathleen Sasser, who is Dedrick's mother, brought suit for Dedrick's injuries against the local baseball league, its national organization, three league coaches, the swimming pool, and a team member's parent on numerous allegations of negligence, including failure to supervise Dedrick while he was at the pool. Appellants settled with the swimming pool; the remaining defendants, who are the appellees herein, were granted summary judgment. Appellants now appeal from that ruling. We affirm.

In the summer of 2000, Dedrick Bradley played baseball in the seven-and-eight-year-old division of the Lafayette County Dixie Baseball League. The league was a franchise of a national organization, Dixie Youth Baseball, Inc., a non-profit organiza-tion that describes itself as being "designed to give young south-erners, who want to play baseball on a local level, an alternative to Little League." Near the end of the season, Dedrick was chosen for the county all-star team. That team played several games and was coached by appellee Johnny Welch, with assistance from appellees Steve Glass and Hodge Walker, all of whom had sons playing in the league.

Once the all-star team was eliminated from its final tourna-ment, several parents, and possibly coaches, decided to have a party for the players to celebrate the end of the season and to hand out trophies. At some point, it was decided that a pool and pizza party would be held at the Pines Swimming Club. One of the team parents, appellee Marla Talley, was a member of the Club, and she arranged for the rental of the pool, paying twenty-five dollars to reserve the pool for 6:00 p.m. on July 25, 2000. The players' families, including Dedrick's grandmother, appellant Brenda Bra-dley, were notified of the date, time, and location of the party. According to Mrs. Bradley, Coach Welch called to invite Dedrick.

On the appointed date, Dedrick arrived at the pool with Mrs. Bradley and another of Mrs. Bradley's grandchildren, age three. Those eventually in attendance would include Coaches Welch, Glass, and Walker and their families; one of the players,

D.J. Ward, who came with Coach Walker because his mother could not come; and Marla Talley and her son. Shortly after arriving at the pool, Dedrick changed into his swimming trunks. Mrs. Bradley was "standing at the end of the pool" talking to the three-year-old and did not actually notice Dedrick getting into the water.[1] However, at a certain point, she realized that she could not see Dedrick, and she asked one of the other parents where he was. After a search was conducted for Dedrick and D.J., who was also missing, Coach Johnny Welch told everyone to clear the pool. He then stood on the diving board and saw the boys at the bottom of the pool. He dove in and brought them to the surface, where he and other coaches and parents administered CPR. Marla Talley, who said that she had just arrived on the scene when the search was taking place, called the police, and paramedics were dispatched. According to Steve Glass, Dedrick began breathing before an ambulance arrived. Dedrick was transported to a hospital in Hope and later to Arkansas Children's Hospital in Little Rock.

On March 18, 2002, and by subsequent amended complaints, Brenda Bradley and Dedrick's mother, Kathleen Sasser, sued Johnny Welch, Steve Glass, Hodge Walker, Marla Talley, Dixie Youth Baseball, Inc., Lafayette County Dixie Baseball, and the Pines Swim Club, alleging that their negligence was the proximate cause of Dedrick's injuries. They alleged that the coaches and the baseball leagues "sponsored" the party; that all of the defendants "planned, scheduled, and coordinated" the party; and that, upon Dedrick's arrival at the pool, he was "entrusted to the care, custody and control" of the defendants. The defendants were alleged to be negligent in numerous respects, including failing to supervise Dedrick; failing to provide various safeguards, including a lifeguard; making misrepresentations regarding the presence of a lifeguard and failing to disclose the absence of a lifeguard during the party; and failing to properly plan the party. Dixie Youth Baseball, Inc., was also alleged to be negligent in failing to provide appropriate instruction, supervision, and direction to its franchise. The defendants, in their answers, denied that they had a duty to supervise Dedrick because, at the time of the incident, he was in the care and custody of Mrs. Bradley, who was present at the scene and who stood *in loco parentis* to him.

---

[1] Photographs in the record indicate that the pool was not a very large one and was enclosed on three sides by a chain-linked fence.

Following discovery, the defendants, appellees herein, filed motions for summary judgment. They argued that, as a matter of law, they breached no legal duty to Dedrick; that the swimming pool was an open and obvious danger; that Mrs. Bradley, who was present at the pool party, had the duty to supervise Dedrick; and that the national organization had no knowledge of or participation in the party. Appellee Marla Talley specifically argued that Dedrick was a licensee to whom she owed no duty other than to warn of hidden dangers and refrain from injuring through willful and wanton conduct.[2] Appellants resisted the entry of summary judgment, contending, *inter alia,* that Dedrick was an invitee rather than a licensee; that the defendants had assumed a duty to supervise Dedrick; and that the defendants failed to take precautions to provide for a safe event.

Attached to the motions for summary judgment and responses were excerpts from the numerous depositions taken in this case. In addition to the facts previously set out in this opinion, the following matters pertinent to appellants' arguments were adduced during the depositions.

According to Mrs. Bradley, Dedrick had lived with her since he was born and she considered herself his mother. She said that Dedrick could swim, both on top of the water and under water; that he liked to swim; and that he had no prior swimming accidents. However, she said that Dedrick had not been in deep water, and, prior to the party, she told him not to engage in horseplay, go off the diving board, or go in the deep end of the pool. She stated that, when she heard that there would be a swimming party, she did not fear for Dedrick's safety because "the coaches invited him, and I assumed he was — they had chaperones" and that she trusted the coaches and the chaperones "to watch over him." However, she said that she had not talked to anyone about what type of supervision there would be at the pool, who the chaperones were, or whether there would be a lifeguard; nor did she see a lifeguard at the pool. Mrs. Bradley recognized that "you don't turn kids loose in a pool without being watched" and that "water is dangerous." However, she said that "they didn't say we had to supervise our own children." Her understanding was that, once she brought Dedrick to the pool, she had no further

---

[2] Mrs. Talley also claimed that she had immunity under Arkansas's recreational-use statute, Ark. Code Ann. § 18-11-305 (Repl. 2003). However, that argument was not addressed by the trial court and is not at issue on appeal.

responsibility for watching over him because she "turned him over to the league," "turned him over to the coaches," and was "not assigned" to supervise the children. She denied being told that she would be responsible for Dedrick at the pool and to bring him at her own risk.

Marla Talley was also deposed, and she said that she rented the pool for twenty-five dollars without expectation of reimbursement. She said that, when she arrived at the party, the women were at the shallow end of the pool and some of the men were at the deep end near the diving board "with the boys." The search for Dedrick and D.J. was in progress when she arrived. When she learned that the boys had been found in the water, she immediately telephoned for help. According to Mrs. Talley, she was aware prior to the party that there would be no lifeguard at the pool and she informed Coach Welch of that fact. However, she said that she did not offer to hire a lifeguard because "we would have adults there, many adults. Every child would have adults there, and we thought that would be sufficient." She also said that the issue of who would supervise the kids at the party was not discussed because "we had parents who would be there that would supervise the children that they brought." She acknowledged that no effort had been made to determine the level of the children's swimming abilities.

In Johnny Welch's deposition, he said that he began coaching in the league because he had been asked to help. When asked if he believed "there was a requirement of safety for the kids as a coach," he responded, "Oh, yes, sir." He agreed that a reasonable, careful person would have had a lifeguard at the swim party and that, if a lifeguard had been on duty, the near-drowning could have been prevented. However, he described the party as a "family event" and said that, "when we done this, we made it understood that the parents would have to be responsible for their own child," and he said that he informed Mrs. Bradley that she was responsible for supervising her child at the party (which Mrs. Bradley disputes). He also said that, at the party, Mrs. Bradley expressed no concern about the lack of a lifeguard. Welch said that all of the players who came to the party had at least one parent with them, except for D.J. Ward, who came with Coach Walker. He acknowledged that he did not ascertain whether the boys could swim.

Coach Steve Glass said that he attended the event as a family member and not as a coach. According to Glass, no one was in charge of the overall event; he did not try to determine whether

any of the boys in attendance could swim; and each parent was responsible for his own child. Two photographs were admitted through Glass's deposition. One showed a sign at the pool that included the words "Swim At Your Own Risk" and "You must obey lifeguard at all times"; another sign read "All Guests Must Register With Lifeguard."

Coach Hodge Walker said that the party was mostly taken care of by Johnny Welch. He admitted that he assumed responsibility for D.J. Ward because he took D.J. to the party and D.J.'s mother was not there. He said that, when he arrived at the party at about the same time as Mrs. Bradley, Dedrick and D.J. were "hollering" to swim, so he asked Mrs. Bradley if Dedrick could swim; she said that Dedrick had swum in a pool behind her house.

There was also deposition testimony regarding the relationship between the local league and the national Dixie organization. Johnny Welch testified that the local baseball league paid a fee to be franchised with the national organization; however, he said, the national organization did not supervise the local league and provided no money or equipment to the local league. The local league relied on parent contributions or fees, which, for Welch's team, was $35 per player. A portion of that money was sent to the national organization for insurance coverage; otherwise, it was used for team uniforms. Welch said that did not have to report to the national organization about the fact that the local league was having a swimming party, nor did he consider the party a "sanctioned event"; rather, he said, it was merely a "family event." Steve Glass also testified that it was not necessary to inform the national Dixie organization about the swim party or, as far as he knew, obtain permission. He agreed, when questioned, that the party could be considered a "Lafayette function," and a "sanctioned" party. Walker said that he did not understand the swim party to be a "sanctioned" event.

Wesley Skelton testified as the commissioner of the national organization. He said that the organization assesses a $10 fee per team and that local leagues have "almost total autonomy" as long as they abide by playing and tournament rules. He said that he was aware that, in some communities, a year-end party is held for the players. However, because the parties do not come within Dixie's rules or regulations, Dixie is not concerned about that. Further, he said, Dixie does not govern activities outside the playing field.

A hearing was held on the motions for summary judgment, after which the trial judge issued two letter opinions. He ruled that

the party was a social event organized by the team parents and thus all persons in attendance were licensees; that there were no hidden or latent defects in the pool of which the defendants had a duty to warn; that Brenda Bradley was aware that the water was inherently dangerous; that custody of Dedrick was never relinquished by Mrs. Bradley to another person; and that it was the lack of parental supervision that proximately caused Dedrick's injuries rather than any willful and wanton conduct by the defendants. Thereafter, orders were entered granting summary judgment to appellees. Appellants now appeal from those orders and make four arguments: 1) that the trial court erroneously focused on the premises-liability aspect of the case and ignored appellants' standard negligence allegations regarding failure to supervise; 2) that there was some evidence that appellees had a duty to supervise Dedrick; 3) that there was some evidence that Dedrick was not under parental supervision at the time of the accident; 4) that there was some evidence that Dedrick was an invitee rather than a licensee.

In reviewing summary-judgment cases, we need only decide if the trial court's grant of summary judgment was appropriate based on whether the evidence presented by the moving party left a material question of fact unanswered. *Moses v. Bridgeman*, 355 Ark. 460, 139 S.W.3d 503 (2003). The moving party always bears the burden of sustaining a motion for summary judgment. *Id.* All proof must be viewed in the light most favorable to the resisting party, and any doubts must be resolved against the moving party. *Id.* The moving party is entitled to summary judgment if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Id.* With these standards in mind, we address each of appellants' four arguments.

### *Trial Court's Failure to Address Ordinary Negligence Claims*

According to appellants, their complaint asserted causes of action both for premises liability, such as failure to eliminate the dangers of the pool, and negligent activity, such as failure to provide adequate supervision. They claim that appellees moved for summary judgment solely on the premises-liability claims, and that, as a result, the trial court granted summary judgment solely on that basis without regard to their claim for negligent supervision. This is evidenced, they say, by the trial court's reliance on Dedrick's status as a licensee.

■ This court has held that a negligent-supervision claim may be analyzed without regard to a child's status on the land. *See Anderson v. Mitts*, 87 Ark. App. 19, 185 S.W.3d 154 (2004) (recognizing that a person who assumes a duty to supervise a child may be liable for negligent supervision, regardless of whether the child is a licensee). However, a full reading of the trial court's letter opinions shows that the court considered both the premises-liability and negligent-supervision claims asserted by appellants. As evidence that the court considered both of these theories of recovery, we observe that, in addition to ruling that Dedrick was a licensee, the court ruled that Mrs. Bradley never relinquished custody of Dedrick to another person; that the appellees breached no duty of care; and that the lack of parental supervision was the proximate cause of Dedrick's injury. Thus, the court went beyond the mere determination of whether Dedrick was a licensee and explored the question of whether appellees were liable for a failure to supervise Dedrick. We find no error on this point.

### Evidence That Appellees Had a Duty to Supervise Dedrick

Appellants' next point is an attempt to bring this case within the purview of *Mitts, supra*. In *Mitts*, a mother who was painting her house voluntarily and deliberately placed her toddler in the custody of the child's aunt, who took the child home with her. While staying at his aunt's house, the child received a severe burn, and the parents sued the aunt. In the ensuing lawsuit, the trial court directed a verdict in favor of the aunt on the basis that the child was a licensee. We reversed, and appellants correctly state the gravamen of our holding as follows: "even if a child is a licensee on the premises, a defendant, even if he or she is a landowner or occupier, owes a duty of reasonable care to provide supervision to the child *if the defendant has been entrusted with and accepted responsibility for supervising a child*." (Emphasis added.) Appellants contend that, in the case at bar, our holding in *Mitts* should apply because there is some evidence that Mrs. Bradley entrusted Dedrick to appellees and that appellees accepted the responsibility for supervising him.

For their claim that appellees accepted responsibility for supervising Dedrick, appellants rely on the fact that Dedrick was invited to the party; that the purpose of the party was to celebrate the end of the season and give out trophies; that, according to Coach Walker, Johnny Welch "mostly took care of" the party; that the party was planned by the coaches and parents; that Marla

Talley rented the pool for the league; that Steve Glass agreed in his deposition that the party was a "Lafayette function"; that Coach Welch said that "there was a requirement of safety" for the kids; that Coach Walker asked Mrs. Bradley if Dedrick could swim; that Mrs. Talley saw the coaches near the boys and thought that they were supervising the boys because they were "right there"; and that Mrs. Bradley was not told that there would be no supervision or to bring Dedrick at her own risk. For their claim that Mrs. Bradley entrusted Dedrick to appellees, appellants rely on Mrs. Bradley's statements that, once she arrived at the pool, she felt that she had no further responsibility for watching over Dedrick and "turned him over to the coaches" or "the league" or "the chaperones."

 We disagree with appellants that these factors show that Mrs. Bradley entrusted Dedrick to appellees and that appellees accepted responsibility for supervising him. In *Mitts*, we quoted a passage from Dan B. Dobbs, *The Law of Torts* § 236 (2001), to the effect that a landowner owes a duty of reasonable care if he has been entrusted with *and* accepted responsibility for supervising the child. This envisions an actual transference of supervisory responsibility from the parent to another person. In the case at bar, unlike the situation in *Mitts*, there was no conscious and deliberate shifting of responsibility from the parent to the purported caretaker; rather, the evidence, even when viewed most favorably to appellants, showed that Mrs. Bradley unilaterally and without communicating her intention, claimed to have turned over responsibility for her child. Further, there is no genuine issue of material fact regarding whether appellees accepted from Mrs. Bradley the responsibility for supervising Dedrick. While appellees may have planned the party and engaged in the ordinary, instinctual supervision that most adults undertake when they are around children, there is no showing that appellees took over supervision from Mrs. Bradley. We therefore decline to bring this case within our holding in *Mitts*.[3]

---

[3] On this point, appellants also rely on the testimony of Coach Walker, who said that he felt responsible for the other injured boy, D.J. Ward. However, D.J.'s mother sent D.J. to the party with Walker. Coach Walker's acceptance of responsibility for D.J. is therefore illustrative of the situation in which a parent unequivocally relinquishes supervision of her child to another person and that person accepts the supervisory responsibility.

### Evidence That Mrs. Bradley Was Not Supervising Dedrick

Unlike the previous point, in which appellants urged us to bring them within the holding of a case, on this point, appellants attempt to avoid the application of the supreme court case of *Moses v. Bridgeman, supra*. In that case, the Bridgemans invited people to their house to make plans for a family reunion. Five or six children were present, among them twelve-year-old Donganell Moses, whose mother was also present and supervising him. The children wanted to swim, and Mrs. Bridgeman provided life jackets, insisted that Donganell wear one, and asked the parents if the children could swim. Later, Donganell was found at the bottom of the pool without his life jacket, having died from drowning. The supreme court affirmed a summary judgment in favor of the Bridgemans, ruling, *inter alia*, that a swimming pool is an open and obvious danger for children and that, if the parent has been warned or the condition should be obvious to the parent, the parent's failure to supervise is the proximate cause of the child's injury. *See also Baldwin v. Mosley*, 295 Ark. 285, 748 S.W.2d 146 (1988). Appellants contend that the ruling in *Bridgeman* is dependent on the factual conclusion that the child was actually under parental supervision at the time of the accident. In the case at bar, appellants contend, there was evidence that Mrs. Bradley was not supervising Dedrick.

█ Although there are clearly some factual differences between *Bridgeman, supra*, and the case at bar, those differences do not change the fact that, in the present case, Mrs. Bradley was undisputedly aware of the obvious danger of the swimming pool, was on the premises when the incident occurred, had not overtly relinquished supervision of Dedrick to appellees, and, as explained previously, there had been no knowing acceptance of supervisory responsibility by appellees. For all practical purposes, therefore, Mrs. Bradley, as Dedrick's parent, was in charge of supervising Dedrick at the party. She cannot cast that responsibility aside simply by stating that she was not supervising her child.

### Evidence That Dedrick Was an Invitee

For their final claim, appellants argue that there was some evidence that Dedrick was an invitee, in particular, a business invitee. A business invitee is a person invited to enter or remain on property for a purpose directly or indirectly connected with the business dealings of the possessor of the land. *Lively v. Libbey*

*Memorial Medical Center,* 311 Ark. 41, 841 S.W.2d 609 (1992). Appellants contend that there is some evidence that the purpose of the party was not merely social (in which case Dedrick would unquestionably be a licensee — *see Bader v. Lawson,* 320 Ark. 561, 898 S.W.2d 40 (1995)) but to encourage participation in the baseball league.

■ Appellants cite *Lively, supra,* where a plaintiff who was injured in a hot-tub accident on her employer's premises claimed that she was an invitee because the employer offered use of the hot tub as a fringe benefit to retain employees and attract prospective employees. The supreme court held that a fact question remained on the issue of whether the plaintiff was an invitee or a licensee. However, in *Lively,* there was deposition testimony by the company president that use of the whirlpool was a fringe benefit of employment. By contrast, in the case at bar, the deposition testimony is devoid of evidence that the party had any business aspect to it or that the league or the national organization benefitted economically from the party. Appellants' claim in this regard is mere conjecture, which is not sufficient to overcome a summary judgment. *See Browning v. Browning,* 319 Ark. 205, 890 S.W.2d 273 (1995). The only, or at least, primary benefit of the party, as shown by the depositions, was social. According to *Bader, supra,* we have declined to expand the invitee category beyond that of a public or business invitee to one whose presence is "primarily social."

In light of the foregoing, we affirm the trial court's grant of summary judgment to appellees.

Affirmed.

GLOVER and ROAF, JJ., agree.